Good morning, Your Honors. Eric Slepian on behalf of Kim Wennet. I am going to reserve three minutes for rebuttal. Please watch the clock. I will do my best. Ms. Wennet was found disabled by the Social Security Administration as of December 22, 2013, and this was not the August 2011 date that she had requested. She continues to receive her benefits. Unfortunately, after going to a hearing, the Administrative Law Judge found that Ms. Wennet was never disabled. He changed the decision of the Administration, and Ms. Wennet is now faced with potentially a very large overpayment that would include repayment of services obtained through her doctors based on billings of Medicare. Excuse me. In your brief, did you outline the law about the repayment? I discussed that she would be obligated to repay if the decision finding her not disabled was to stand. I don't know that I provided citations, but I don't think that's an issue. We don't need to worry about it. No, I think we just need to be aware that absent a remand, she's subject to a potentially very large overpayment. Well, you say that as if we have to hold it, but then you say, no, it's not an issue before us. Which is it? That's not an issue that you are ruling on. I'm giving background information in terms of the process that we went through that brought us here today. So you're raising an equitable concern. Is that the purpose of telling us she might be subject to a repayment? I'm raising it so that the court has all the facts. But this isn't a fact that's relevant to our decision. That was my understanding. No, this court's to decide whether or not the – I'm sorry for interrupting you. This court's to decide whether or not the decision of the administrative law judge is free of legal error. And one of the substantial issues that we've raised in the briefing is that not only have five treating sources found that Ms. Winnett could not sustain work, but also one Social Security consulting physician found Ms. Winnett unable to perform her past work. And the Social Security Administration submitted an analysis that's part of the record indicating that Ms. Winnett would be unable to sustain work and that this particular administrative law judge rejected all of that evidence in favor of a doctor who examined Ms. Winnett once. So the ALJ seemed to reject Winnett's testimony, your client's testimony, and the various other physicians in the record based on three different points. One was BOW's objective findings, which he credited and gave great weight, the conservative treatment that Winnett had rejected, narcotics and Botox despite recommendations, and the ADLs, which included a long list of walking, packing, vacations, helping parents, packing up houses, five days, and whatever. So those were the three grounds that the ALJ relied on. So my question is, is that substantial evidence supporting the ALJ's conclusion? Is it that there was specific, clear, and convincing, or however we formulated, reasons for rejecting the testimony and the other doctors? So if you could focus on the argument as to why those three bases for the ALJ's decision did not constitute substantial evidence, that would help me. Okay. So, Your Honor, in terms of the objective evidence, the type of impairment that Ms. Winnett suffers, it's muscle contractions, it's the placement of the neck, and there is objective data. I note at pages 772. Well, there's objective data supporting her claims. There's the various physicians who wrote up reports, which the ALJ gave little weight to or less weight to, primarily, I think, relying on Dr. BOW, the conservative treatment, and the ADLs. So it doesn't matter if there's substantial evidence supporting your client's position. The question is, was there substantial evidence supporting the ALJ's conclusion? Right. And so it's difficult for me, because your time is ticking. What's unusual about this case for me is that the expert, BOW, I don't know if I'm pronouncing that name correctly. I'm going to call him BOW for the moment, unless you want to correct me. It seems to me quite extraordinary that he didn't look at her medical history. He looked at one prior indication, and only the indication of the individual who examined her on one occasion when she was just at the cusp of perhaps going part-time, perhaps actually giving up her retirement. So my question on that provision is, or that component is, who decides what Dr. BOW looks at? Why didn't the consultant look at why wasn't he provided with her complete medical record? Do you know that? So it's a very good question. And the regulations state that they're supposed to give the consultant all the necessary background information. Do we know if that happened? It didn't happen. Who's supposed to? Who's supposed to give the doctor the necessary? The administration. It's one of their consulting physicians. So do we know if he didn't look at it, or do we know if he had it? So the physician writes in his report that he looked at one record. My experience would tell me that that's all they gave him, but I'd have to go back and reread the report to see if he sheds more light on that. Dr. BOW, we don't know what he did with the ‑‑ because she has a medical history that is unusual in its consistency, and she has a lot of objective findings of the particular types of disability, and they're noted repeatedly over and over again by her treating physicians. And so that's how we get down to this. The ALJ is not bound by that, for sure, but Dr. BOW had to ‑‑ or the ALJ does have to get specific legitimate reasons for discounting it. And so I struggle there. But as Jeff Jakuda said, there's Dr. BOW's findings, right, and he met with her one time and described her. But then, of course, there's a whole lot of treating history there, and we don't know what he did with that. There's the conservative treatment. She didn't want to have Botox. There is no indication that there is any surgery available, but Dr. BOW makes this mention that she didn't have surgery. Is there any surgery available to treat this type of condition? No. Well, let me ask about that. Go ahead, please. Can I ask about the Botox, since you raise it? So it was recommended twice by one of her ‑‑ twice or three times by one of her physicians. She turned it down based on her own subjective views. Was there any evidence in the record that Botox raised the risks that she was concerned about? All I saw was a report of her views. I don't want unnatural substances in my body. I'm worried that it will paralyze a nerve. But the doctor continued to recommend it. So was there any medical information raising those risks? Well, I don't know that the doctor mentioned those risks in the records, but you would assume that the doctor discussed the risks with the claimant. Okay, so there's nothing in the record. No, but there's medical literature that we've cited that proves the point. You mean the medical literature proves a fact that we're supposed to accept? Medical literature proves that there's risk to Botox injections. I don't think that that's in dispute. And so just because the doctor doesn't write, it's like a doctor recommending surgery. There's risk of death in every surgery, but the doctor usually doesn't write it. There's a risk of crossing the street. The difficulty I have with your position is it makes me become an expert on Botox, with which, fortunately, I've had no experience, so I have to rely on records. But can I rely on somebody else who's written a book? That doesn't seem to be a way to determine factual determination. So you can rely on Social Security Policy Ruling 16-3P as well as 96-7P, which was replaced by 16-3, which talks about the claimant's view of the risks in proceeding with a medical procedure. So if a claimant feels that it's risky, then it doesn't count, even though I would heal them and they would still be eligible. Is that your argument? Well, I have a problem with the question because this Botox will not heal her. I don't know that. Do I? Is there something in the record that says it will not? Yeah, I don't recall. I mean, it's a medical fact, so I don't know how to answer your question. I think there's certainly indications in the record that there is no treatment for this condition. I mean, there's no cure. Forgive me, no cure for the condition. So I think Judge Wallace is asking the more specific question. Is there any place where it says that Botox won't cure? Because it certainly says there isn't any cure. Botox, well, there's no cure, which is correct. So would Botox help with some of the symptoms? There's great risk in trying it, so that's what makes it hard. All we know is the doctor recommended it. Your time has actually expired. We'll give you a minute for rebuttal since we took you over time. Thank you. May it please the Court. Jordan Goddard appearing on behalf of the government. Good morning, Your Honors. Mrs. Winnett certainly has a rare neurological condition. No one disputes that. It limits her in some ways, but there is substantial evidence in the record supporting the ALJ's decision that it did not limit her as much as she claimed, and it did not limit her to the point where she could not continue to do her work as an elementary school teacher. One of the most glaring pieces of evidence in the record is the extensive travel that is documented throughout the record. Counsel, one trip was to New York for her son's wedding. The problem I have is she's not supposed to be required to sit home and do nothing. There's an impressive, I think, history of her continuing to try to work and trying to avoid narcotics medication. Her physicians talked to her at length about, you know, in 12 years, I think, wearing this neck brace, including to the extent of dislocating her ribs and whatnot. And what seemed to me to be notable about the history you're talking about with the travel is that she seemed to pay for it each time. She seemed to pay for it? You mean physically not? Yeah. Oh, yes. I didn't mean pay for the ticket. Sorry. Threw me for a second. Right. But that seemed to me to be a very consistent timeline, that when she tried to do these kinds of trips or activities, it was quite difficult for her, and the record reflects that. So I'm just concerned that she's being punished for trying to do anything. Well, I would take issue a little bit with that characterization of the record, Your Honor. First of all, there are a number of trips where she doesn't report it taking a toll on her. Most notably, she took a vacation to Italy, which was, you know, not just a short trip at all, and there were no complaints afterwards about problems. In fact, she described it as a good trip. You mentioned New York and the son's wedding. In fact, she seems to travel to New York every year to visit her son. And so what is the problem with her traveling? Well, it's not so much a problem, Your Honor. And if it was just a single trip here or there, I — And the question is whether she can work, not whether she can travel, counsel. So it just — this struck me as a real — I'll listen to what you have to say on this. Thank you, Your Honor. I mean, this is a record that demonstrates — I count at least 10 different vacations in about a three-year period, or 10 different trips. So we're not talking about someone who took one vacation, had a lot of trouble. We're talking about someone who has taken multiple trips to Mexico. And when you talk about — But it's not like she's, you know, surfing in Mexico or hiking in Mexico or climbing mountains in Mexico. It's one thing to sit on an airplane. You're talking to three people who sit on airplanes a lot, right? And quite — so I was more concerned, for example, about — and I think it's a fair point to talk about her helping her parents pack up their house. That's physical activity. But sitting on an airplane, that's a hard sell for me. Well, we've also got river rafting. And again, we're talking about someone who's claiming to be extremely physically limited. And when you look at some of these medical opinions that were rejected, they — the doctors are checking the most extreme limitations on the form. And so when you look at it, I think if you isolate any single trip, you can say, okay, that doesn't prove anything. But when you look at the evidence as a whole, when you have 10 trips, and when you look at the nature of the complaints, for example, when she took a four-day trip to Mexico with her girlfriend, she came back and said, it really aggravated my dystonia, my neck condition, because we spent the trip traveling on rutted dirt roads, and the bouncing around really hurt me. So when we're comparing it to this claim that I can't be an elementary school teacher, or for instance, when she goes to New York, she complains not actually of problems with her dystonia, the disabling condition. She comes back and says, I've got sore calves because my son lives in a five-story building with no elevator. And so I've been climbing stairs for days. We actually have a lot of activity that, when you look at it as a whole, indicates a greater physical capacity than she's alleging. And then we throw in something like the moving, where she spent five days, by her own account, moving her parents. She said she had to do all the work by herself. Her parents live 100 miles away from her. So when you compare the types of claims that she's making, that she's extremely physically limited, that she basically cannot sit comfortably for any amount of time, it becomes a little bit difficult when you look at all of these activities. Can I ask you another question? Did the government give this expert her medical history? Because he makes no mention of it, counsel. It's very concerning. I don't know. I don't know. It's not on the record. I have no way to find that information out. Do we know whether anybody advised her after having, I think there are discussions of resorting to narcotic pain medication. She said she didn't want to do that. Her treating physician clearly told her, had she done that, she would be narcotic dependent. As far as, that's in the record. As far as the Botox is concerned, there are several, I think there's at least three times where someone discussed Botox with her. But I don't know if anybody said, you know, we advise that you do this, having weighed the risks and benefits. Can you show me where that was done? The discussions of Botox? I'm just trying to figure out if on balance it was recommended that she go forward. I thought Dr. Tobin had recommended it to her and even made an appointment for her to go talk to someone about getting the Botox. I think that's exactly right. There was a discussion to go, you know, sort of consider this. And I'm trying to figure out whether, because, of course, there are some risks associated with Botox, and whether or not there was a discussion of risks and balances that she should go forward. Do we know that? We don't. But the ALJ's point is a little bit different there. As Judge Ikuta has pointed out, the problem is really that she was told, you should go talk to this neurologist about this. You should go have this discussion, because this is a common treatment. The ALJ also talks about surgery counsel, and there is no indication that there's available for this type of treatment that I can see. Please tell me if I'm wrong about that. I'm not aware of any, no. All right. I would concede error on that point, but I believe it is a harmless error in light of all the other reasons given. Okay. And, again, when it comes to the Botox, it's her unwillingness to have that discussion with the specialist that is the salient fact here. That's what's important, the unwillingness to actually pursue this, to go talk to that specialist who would be able, the neurologist, who would be able to say, these are the risks and benefits. She said, no, I'd rather not. But she said, I'd rather not. I don't want something that's going to paralyze a nerve. That's what Botox does. And so it's, I find, again, it's, so is the conclusion we should read that that is an unreasonable condition, or that, I think the inference that you're asking us to endorse is the inference that because she took that position vis-a-vis narcotic pain medication surgery that's nonexistent. But, you know, in fairness, particularly the Botox, is that we should discount the extent to which this was a disabling condition or a painful condition. Yes. It was reasonable for the ALJ to draw an inference that her unwillingness to even go have that discussion took away from the credibility of her pain complaints. And I would also add that when it comes to narcotics, Dr. Tobin noted that while she said that she just doesn't want to have unnatural things in her body, she actually did rarely use hydrocodone. And it's really her, so she did actually use it, but the point there was that she only used it rarely. So she, it's not as if she was unwilling to use this medication or that she just wouldn't do it. And that's the kind of record that we really frequently see and rely upon, especially in But this woman was wearing this neck brace for 12 years. She's got a medical record that is replete with indications of, you know, objectively that she's asymmetric, that her rib is being dislocated by this brace, that she's obviously twitching and spasming, jerking, you know, visibly, and will place this as violently. So that's why it really seemed qualitatively different to me. Because I don't think anybody doubts that she's got these conditions since her treaters are all observing it, right? Is that right? I mean, I'm not sure. The question is, does anybody doubt, unlike in a soft tissue injury where there's a concern about whether she actually suffers from this, she's got this, there's really objective manifestation of this condition, right? Yes, though I think you also have to look at Dr. Bao's examination results. And while you do fault Dr. Bao for not clarifying what medical records he looked at, what he does is he does the most extensive physical examination that's in the record. His examination results are far more detailed than any examination results from a treating physician. And while he does recognize that there are certain limitations, he notes things like she actually has a moderately good range of motion in her neck, she has full grip strength all through her arms, no reflex issues. He actually does what we would call capacity testing, which is similar to the testing that her own physical therapist did on two occasions, which produced results very similar to Dr. Bao's, which was that she wasn't nearly as physically limited as she claimed to be. This was a year after she'd been out of work. Is that right? Excuse me? This is a year after she had been, had retired and had undertaken her physical therapy regime, I think. Yeah, so the most recent one was in December 2014, where she had five physical therapy sessions. Okay, forgive me. You've answered my question. Judge Wallace is trying to ask one. I wanted to slip in a question here. We've been extending the people that we are allowed to give opinions. It used to be doctors and now nurses and people who greet them at the desk and whatever. And I notice here that the ALJ did not accept the acupuncturist. Do we have any cases on them? We've had some cases on others. But is there any cases that the ALJ can be faulted for not accepting that as an acceptable medical source? Cases, no. But the regulations do actually make it clear that there is a divide. And the change in terms of who we accept opinions from is based on the filing date of the application. And she is under the old regulatory scheme without question. And the case law that you're referring to is under that old scheme. And under that, the chiropractor and the naturalists are not considered acceptable medical sources. And so the ALJ had no obligation, in fact, should not have under the regulations in the case law in effect for this case. How about a doctor of osteopathic? The DOs for a long time were not accepted as MDs because they do a lot of hands-on stuff. What's the position of the board on opinions from the DOs? The DOs have long been accepted as equivalent to MDs. And I think I do need to quickly, even though I'm over time, correct myself. When it comes to chiropractors, even under the new regulations, I am quite certain that chiropractors are actually not acceptable medical sources. It's nurses that are the big change there. But chiropractors and naturalists, they still fall under the old, are still treated the same way as not acceptable medical sources. Okay. Thank you. Thank you. We'll give you a minute for rebuttal. Thank you. So there's something I want to point out that I think needs mentioning, and that is that at the time of the onset date of disability, Ms. Winnett was 55 years old. Her past work was described as being a medium job, meaning stand and walk all day, pretty much all day, and lift up to 50 pounds. Now, the vocational consultant testimony is with that particular RFC the judge issued, she couldn't do the past work as she performed it. So then we look at whether or not this judge found she could do her past work as a general teacher with a light RFC. I want to point out that if she can't do her past work because she's limited to less than light, she wins. So when the commissioner says, oh, look at all she's doing, it doesn't show she's not disabled, because to do her past work, she'd have to be able to stand and walk for six out of eight hours and lift up to 20 pounds eight hours a day, five days a week on a regular and continuous basis. Otherwise, this decision is not supported by substantial evidence. I want to quickly go over some of the vocational expert testimony. You're over time, so please wrap up. Okay. Really quickly. The expert testified that if when it suffered from moderate pain, that she would be unable to perform her past work. If her pain caused her to be off task 5% of the work day, she'd be unable. We have that in the record, so if you have a final comment, but I think you're over time now. Okay. So my final comment is no doctor disagreed with the off task provision or the pain provision. Thank you. All right. The case of Kim Winnett versus Nancy Berryhill is submitted.
judges: Wallace, Ikuta, Christen